IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In re: | : |
| | :    Chapter 11 |
| IFS Securities, Inc. | : |
| | :    Case No. 20-65841-lrc |
| Debtor. | : |

**JOINT OBJECTION BY CREDITOR R. BRYAN EDWARDS AND CRAIG WALKER TO THE MOTION FOR RELIEF FROM AUTOMATIC STAY FILED BY INTL FCSTONE FINANCIAL, INC. (DOC 26)**

"Unsecured creditors are generally entitled to relief from an automatic stay only in extraordinary circumstances." *In re Feingold*, 730 F.3d 1268, 1277 (11th Cir. 2013) (quoting *Milne v. Johnson (In re Milne),* 185 B.R. 280, 283 (N.D.Ill.1995)). But the only extraordinary feature of the motion by INTL FCStone Financial, Inc. for relief from the automatic stay is the harm that granting such relief may inflict on the Debtor's estate and creditors. The motion should therefore be denied.

1

The Debtor's arbitration claim against INTL may well be the largest asset of the estate in this bankruptcy case. Indeed, the arbitration claim on its face seeks every penny, and more, of the alleged "rogue trading" losses that the Debtor contends necessitated this bankruptcy in the first place. If the Petition in this bankruptcy case is to be believed, the $30 million-plus requested in the arbitration claim would cover all of the currently listed claims in the bankruptcy. It is therefore vitally important to get the arbitration claim right.

Such a potentially critical claim must not be rushed. It must be planned with care and pursued with vigor and diligence by good-faith, disinterested actors who are concerned only with the best interests of the estate.

The problem is that the debtor-in-possession, including its principal, Alex McKenzie, are not the good-faith, disinterested litigants that the claims against INTL need. Quite the contrary, Mr. McKenzie is potentially far more culpable in the Debtor's failure than he is leading the Court to believe—there is evidence, for instance, that he knew of the supposedly "rogue" trading months before he claims to have discovered it—and his arbitration filing seems aimed at least as much at protecting himself from liability as it is at pursuing the claim against INTL. There is therefore a substantial risk that, at every stage of the claim, including, critically,

2

settlement negotiations, Mr. McKenzie will be motivated by a self-interested desire to shut the claim down and thus prevent INTL from probing and exposing his true role in the Debtor's meltdown. (Indeed, INTL's defenses and proposed counterclaims will almost surely implicate Mr. McKenzie's personal conduct and thus further compromise his ability to disinterestedly pursue the Debtor's claims for the benefit of the estate.)

Simply put, Mr. McKenzie and his debtor-in-possession are the wrong people to pursue the arbitration claim and to defend against the counterclaims. Therefore, the arbitration matter should not proceed until this bankruptcy proceeding is further along, the facts concerning the Debtor are more fully developed, and appropriate persons to manage the arbitration claim can be identified and appointed.

For these reasons, as further explained below, INTL's motion marks a critical turning point that could fatally undermine the success of this entire bankruptcy case and the fates of the creditors' claims. INTL's motion should be denied, and the automatic stay should be enforced.

## BACKGROUND

The Debtor, IFS Securities, Inc. ("IFS Securities" or the "Debtor") was a broker-dealer and, specifically, what is called an "introducing broker." As such, it relied on larger "clearing brokers" to handle its back-office functions and other matters. (Doc 26-1 at 5.)

INTL was the Debtor's clearing broker for fixed-income securities transactions. (*Id.*)

Before it filed this bankruptcy case, the Debtor instituted an arbitration proceeding against INTL. The Debtor's claim in the arbitration alleges that INTL knew about alleged "rogue trading" that drove the Debtor to insolvency and failed to report or prevent it, thus causing the Debtor to suffer millions of dollars in losses. (Doc 26-1 at 23, 25—26.)

Creditors R. Bryan Edwards and Craig Walker contemplate that these allegations against INTL may well be true, and the claims valid. They certainly want the matter to be thoroughly explored and vigorously pursued for the benefit of all the creditors.

The problem is that the Debtor's principal, Alex McKenzie, appears potentially culpable as well, in ways that preclude him from disinterestedly

4

pursuing the claims against INTL. At a minimum, assertions made about him in this bankruptcy case and in the arbitration appear to be false.

The petition asserts that Mr. McKenzie was oblivious to the allegedly "rogue" trading until July 2019 (Doc 1), and the arbitration claim suggests his ignorance extended into August 2019 (*see* Doc 26-1 at 22—23). It is also asserted that the allegedly "rogue" trader was acting completely outside his authority. But numerous facts undermine these assertions:

> ➤ The alleged "rogue" trader (Keith Wakefield) was head underwriter in charge of sales and trading at IFS Securities. He had proprietary trading authorization and conducted proprietary trades on a regular basis, either in consultation with, or on a revenue-sharing basis with, Danny Weeks, with Mr. McKenzie's approval. (Declaration of Craig Walker, filed herewith, at ¶ 8.)
>
> ➤ Upon information and belief, Mr. Wakefield had a $10 million dollar per-trade limit, authorized by Mr. McKenzie.
>
> ➤ There was apparently a proprietary trading loss of $1.4 million reflected on the debtor's May 31, 2019 net capital statement. (Doc 26-1 at 20.) Such a loss was far outside the range of ordinary or tolerable losses for

5

a firm the Debtor's size. (Walker Decl. at ¶ 10.) Thus, to the extent Mr. McKenzie was not previously aware and approving of Mr. Wakefield's trading, he should certainly have spotted it from that May 31 statement.

➢ In early May, 2019, debtor's Senior Vice President Craig Walker (one of the creditors making this objection) discovered, and personally informed Mr. McKenzie of, a bond trade, which was losing significant money and which Mr. Wakefield had authorized. Mr. McKenzie claimed not to be aware of that trade, and he told Mr. Walker he would discuss the matter with Mr. Wakefield. Later, when Mr. Walker asked again about the trade, Mr. McKenzie said he had talked with Mr. Wakefield, but Mr. McKenzie gave only a weak excuse for the trade. Shortly thereafter, Mr. McKenzie placed Mr. Walker on administrative leave. (*Id.* at ¶ 11.)

➢ It seems the unauthorized bond trade that Mr. Walker found was part of the scheme to cover up the large risk Mr. Wakefield was incurring elsewhere, and the apparent purpose of getting rid of Mr. Walker was to keep Mr. Walker (whose office was next to Mr. McKenzie's) from

being able to witness any further the moves that Mr. McKenzie and Mr. Wakefield were making.

These facts are serious red flags. They underscore the need to investigate thoroughly the events leading up to the Debtor's insolvency and the causes and perpetrators of those events before allowing the Debtor or INTL to hash their respective claims out in arbitration.

## ARGUMENT

INTL's motion fails for either of two reasons. *First,* INTL has failed to carry its initial burden of showing the "cause" that is required for any relief from the automatic stay. *See In re Groover*, 411 B.R. 460, 462—64 (Bankr. S.D. Ga. 2008) (noting initial burden to show cause is on movant). The "cause" INTL purports to show is based on an erroneous legal argument. *Second,* the totality of the circumstances here shows there is no cause. Rather, the interests of the estate and the innocent creditors—basically anyone not facing potential liability for bringing about the Debtor's failure—are best served by leaving the automatic stay in place.

7

### A. The Movant, INTL, Has Failed to Carry Its Burden of Showing Cause.

When the lead argument asserted in support of a motion is completely unsupported by the very authorities that the motion cites, it is a sure sign the motion is a bust. Such is the case here. INTL's motion relies on the mistaken proposition that any non-core proceeding that is subject to an arbitration agreement must, for that reason alone, be exempt from the stay. The law says no such thing.

The cases on which INTL relies do not even address the automatic stay. They concern only *whether* claims subject to an arbitration provision must be arbitrated; they are silent as to *when* such arbitration may occur.

In the first so-called "binding precedent" that INTL cites, *In re Elec. Mach. Enterprises, Inc.*, the Court held that "the district court erred when it upheld a bankruptcy court's denial of a motion to compel arbitration." *In re Elec. Mach. Enterprises, Inc.*, 479 F.3d 791, 793 (11th Cir. 2007). The word "stay" does not appear in the opinion, nor does the opinion cite or discuss the automatic stay provision, 11 U.S.C. § 362. *See id.*

Similarly, the *In re Dixon* case on which INTL relies addresses an adversary proceeding, and in that case, "the only issue [was] whether there is an inherent conflict between enforcing the arbitration agreement and the purposes of the

8

Bankruptcy Code." *In re Dixon*, 428 B.R. 911, 914 (Bankr. N.D. Ga. 2010). The question was arbitrability, not whether the automatic stay applied to an arbitrable claim.

In other words, INTL's motion conflates two questions, treating them as a single inquiry when, in fact, they are entirely separate. The first question, which the cited cases do address, is whether certain claims must be arbitrated, *i.e., where* they must be determined. In this bankruptcy case, that decision is for another day. The question raised by INTL's motion is different. The question the motion raises is *when* the claims should be determined, *i.e.*, whether they are subject to the automatic stay, and the cases cited by INTL do not answer this question.

Of course, the reason INTL fails to cite pertinent law is that there is none. The claims INTL and the debtor seek to arbitrate are and should be subject to the stay. As INTL concedes in its motion, the automatic stay applies broadly to claims against the estate:

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title

9

11 U.S.C. § 362 (a)(1). It also applies to "the setoff of any debt owing to the debtor that arose before the commencement of the [bankruptcy] case … against any claim of the debtor." 11 U.S.C. § 362(a)(7).

The stay therefore applies to the claims (and proposed counterclaims) in the arbitration, and INTL's motion, relying as it does on an erroneous legal premise, provides no "cause" for exempting it from the stay. For this reason alone, INTL's motion should be denied.

### B. There Is No Just Cause for Granting INTL an Exemption, Because Doing So Threatens Grave Prejudice to the Estate and Creditors.

Moreover, the existence of cause depends on the "totality of the circumstances." *In re Feingold*, 730 F.3d at 1278; *In re George*, 315 B.R. 624, 628 (Bankr.S.D.Ga.2004). This includes, among other things, balancing the hardship to INTL if it is not allowed to proceed immediately with the arbitration against the potential prejudice to the debtor, the estate, and other creditors. *In re Carraway Methodist Health Sys.*, 355 B.R. 853 (Bankr. N.D. Ala. 2006). Here, that balance leans decisively against giving INTL an exemption.[1]

---

[1] "There is no set list of circumstances that a bankruptcy court is required to consider in evaluating whether § 362(d)(1) 'cause' exists to lift the automatic stay. Rather, courts evaluating whether to grant stay relief have looked to a variety of

10

As shown above, the claims and counterclaims in the arbitration leave the Debtor's current principal, Mr. McKenzie, highly conflicted both in pursuing the arbitration and in attempting to resolve it. This is because, distinct from the rights and liabilities of the Debtor itself, there will be critical issues surrounding Mr. McKenzie's personal behavior, culpability, and liability. These issues threaten to influence decisions about whether and how to press issues; they will loom over decisions whether to pursue or make discovery; and, perhaps most ominously, they render Mr. McKenzie hopelessly compromised when it comes to negotiating a potential settlement, as he may encounter the temptation to settle the claims at a discount to avoid inquiries and issues he finds personally uncomfortable.

These concerns implicate numerous factors that courts consider in the balancing of interests that a motion like this requires, including (1) whether litigation in another forum would prejudice the interest of other creditors; (2) the interests of judicial economy and the expeditious and economical resolution of

---

case-specific factors[.]" *In re Feingold*, 730 F.3d at 1277. These factors may include such things as "(1) whether the debtor has acted in bad faith, … ; (2) the hardships imposed on the parties with an eye towards the overall goals of the Bankruptcy Code, … ; and (3) pending state court proceedings[.]" *Id.* (punctuation and citations omitted).

11

litigation; and (3) the impact of the stay on the parties and the balance of harms. *See generally In re Feingold*, 730 F.3d at 1277.

Moreover, there is no compelling reason why the arbitration must race to some hasty conclusion. Indeed, the proceeding has not even started. INTL has not answered, so, presumably, no panel has been selected. No discovery or motion practice has occurred, and the parties are certainly not on the brink of a final hearing. *See, e.g., In re Groover*, 411 B.R. at 462—64 (citing cases where request for exemption from stay was denied because state-court litigation had not reached discovery stage).

## CONCLUSION

Lifting the stay while Alex McKenzie remains at the helm of the debtor risks having the claims in arbitration pursued half-heartedly by a conflicted principal with an eye on his own personal liability, to the detriment of the estate and the creditors. And that's actually a best-case scenario. The even graver threat is that the claims might quickly be settled, possibly at a steep discount, before the arbitration proceeding (including the proposed counterclaims) exposes facts harmful to Mr. McKenzie.

12

Simply put, INTL's motion is extraordinary and may only be granted upon a showing of "extraordinary circumstances" creating a special entitlement. *In re Feingold*, 730 F.3d at 1277. INTL has failed to show such circumstances, and none exist.

Therefore, because (1) INTL's legal arguments do not show cause for exempting it from the stay, and (2) the totality of the circumstances here confirms there is no cause for doing so, creditors R. Bryan Edwards and Craig Walker respectfully object to the Motion of INTL FCStone Financial, Inc. for Relief From the Automatic Stay (Doc 26) and request that it be denied.[2]

Respectfully submitted this 15th day of May, 2020.

*[SIGNATURES APPEAR ON NEXT PAGE]*

---

[2] Counsel for R. Bryan Edwards is authorized to state that Craig Walker, who has appeared pro se in this bankruptcy case, joins in this Objection.

| | |
|---|---|
| WATSON SPENCE LLP<br><br>*/s/ Lucas W. Andrews*<br>Lucas W. Andrews<br>Georgia Bar No. 019533<br>999 Peachtree Street NE<br>Suite 1130<br>Atlanta, Georgia 30309<br>Telephone: (678) 433-6756<br>landrews@watsonspence.com<br><br>*Attorney for Creditor R. Bryan Edwards* | CRAIG WALKER<br><br>*/s/ Craig Walker* with express permission by LWA<br>Craig Walker<br>650 GlenBarrett Ct., NE<br>Marietta, Georgia 30066<br>(404) 416-9065<br>craig.walkeratl@gmail.com<br><br>*Pro Se* |

14

## CERTIFICATE OF SERVICE

I hereby certify that I have caused electronic copies of this Notice to be served by United States Mail (postage prepaid) and electronic mail as follows:

>John D. Elrod
>Greenberg Traurig LLP
>Terminus 200, Suite 2500
>3333 Piedmont Road, NE
>Atlanta, Georgia 30305
>elrodj@gtlaw.com
>
>Office of the United States Trustee
>362 Richard B. Russell Building
>75 Ted Turner Drive SW, Suite 362
>Atlanta, Georgia 30303
>jonathan.s.adams@usdoj.gov
>
>Ryan D. Thompson
>Maynard, Cooper & Gale, P.C.
>1901 Sixth Avenue North
>2400 Regions/Harbert Plaza
>Birmingham, Alabama 35203
>rthompson@maynardcooper.com

Respectfully submitted this 15th day of May, 2020.

/s/ *Lucas W. Andrews*
Lucas W. Andrews
Georgia Bar No. 019533
999 Peachtree Street NE,
Suite 1130
Atlanta, Georgia 30309
Telephone: (678) 433-6756
landrews@watsonspence.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

In re:                              :
                                    :     Chapter 11
IFS Securities, Inc.                :
                                    :     Case No. 20-65841-lrc
     Debtor.                        :
                                    :

## DECLARATION OF CRAIG WALKER

Craig Walker, under penalty of perjury and under 28 U.S.C. § 1746, states as follows:

1. My name is Craig Walker. I am over the age of 18 and competent to testify to all matters asserted in this Declaration.

2. The statements in this Declaration are based on my personal knowledge.

3. For approximately seven years I was a Senior Vice President at IFS Securities, Inc. ("IFS Securities").

4. I was a leading broker within the Public Finance Group of IFS Securities.

5. I have also served on the IFS Securities credit committee, reviewing all relevant investment banking assignments within the firm.

6. During 2019, my office at IFS Securities was directly next to that of the company's principal, Mr. Alex McKenzie.

7. I was intimately familiar with the strategic initiatives of IFS Securities.

8. Mr. Keith Wakefield was head underwriter in charge of sales and trading at IFS Securities. He had a proprietary trading authorization and conducted proprietary trades on a regular basis, either in consultation with, or on a revenue-sharing basis with, Danny Weeks, with Mr. McKenzie's approval.

9. I have read the arbitration claim filed by IFS Securities against INTL FCStone. The claim states that there was a proprietary trading loss of $1.4 million reflected on the May 31 net capital statement of IFS Securities.

10. A loss of $1.4 million was far outside the range of ordinary or

11. In early May, 2019, I discovered, and personally informed Mr. McKenzie of, a bond trade, which was losing significant money and which Mr. Wakefield had authorized. Mr. McKenzie claimed not to be aware of that trade, and he told me he would discuss the matter with Mr. Wakefield. Later, when I asked again about the trade, Mr. McKenzie said he had talked with Mr. Wakefield, but Mr. McKenzie gave only a weak excuse for the trade. Shortly thereafter, Mr. McKenzie placed me on administrative leave.

12. I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 15, 2020.

*Craig Walker* (signature)
Craig Walker

2